IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -v-                     02-CR-73-A (1),(5),(9),(15)

MARK CONGI,
ALBERT CELESTE,
PAUL BELLRENG,
JOEL CICERO,

               Defendants.

## GOVERNMENT'S PRE-TRIAL BRIEF AND MEMORANDUM

The United States of America, by and through its attorneys, Terrance P. Flynn, United States Attorney for the Western District of New York, and William J. Hochul, Jr. and Brett A. Harvey, Assistant United States Attorneys, hereby submits its pre-trial brief and memorandum.

## I.   INTRODUCTION

On June 25, 2003, the United States Grand Jury returned a fourteen-count Second Superseding Indictment ("Indictment") accusing the defendants and eleven other men with committing a wide variety of violence, sabotage and property destruction on construction sites located in Niagara County, New York. More specifically, the Indictment alleges that defendants (excluding

CICERO), members of Laborers International Union of North America, Local 91 ("Local 91"), used actual and threatened force, violence, and fear, in an effort to obtain for themselves and other members of Local 91:

a.   Property of construction contractors and businesses consisting of jobs, and the payment of wages and benefits associated with those jobs, at construction projects in Niagara County, New York.

b.   Property from non-union construction laborers working in Niagara County, New York, consisting of the jobs being performed by those non-union laborers, and the payment of wages and benefits associated with those jobs.

c.   Property from employees, who are members of unions other than Local 91, working in Niagara County, New York, consisting of the jobs being performed by those union employees, and the payment of wages and benefits associated with those jobs.

Indictment, ¶¶ 9(a)-(c).

The instant trial involves four Local 91 members, each of whom held positions of leadership and power within Local 91.  Defendant

MARK CONGI variously held positions of President, Vice President, Executive Board member, and Business Agent during the relevant time period of the Indictment.   Defendant ALBERT CELESTE served as Assistant Business Agent.   Defendants JOEL CICERO and PAUL BELLRENG respectively held positions of Vice President/training director and labor steward.

As to specific criminal violations, the Indictment accuses defendants CONGI, CELESTE, and BELLRENG of engaging in a racketeering conspiracy in which it was agreed that a conspirator within the Local 91 Criminal Enterprise would commit at least two acts of racketeering activity.   The racketeering activities consisted of numerous acts of extortion (and attempted extortion) in violation of both New York State and federal law.   Many specific acts of extortion and attempted extortion are set forth in the Indictment.[1]   Additionally, defendants have been notified via both discovery[2] and bills of particulars[3] of other extortionate acts

---

[1]The Indictment enumerates twenty racketeering acts either agreed to or committed by the defendants, and an additional 56 overt acts also committed by the defendants and other conspirators in furtherance of the conspiracy.

[2]Discovery was continuously available to defense counsel from 2002 until preparation commenced for this trial.   Additionally, counsel has had the Jencks Act material, which further identifies the vast majority of the events described herein, since March, 2005.

[3]The Government filed its most recent bill of particulars on August 3, 2005.

which the Government will introduce at trial, and which is summarized herein.

The Indictment also charges specific defendants (including CICERO) with substantive counts of extortion, attempted extortion, and a single count of interstate travel in aid of racketeering.  In what will be a sentencing issue for the trial jury in the event of a conviction of any defendant under Count One, the Indictment also seeks forfeiture of proceeds and interests of property and contractual rights derived from the enterprise and racketeering activity charged in the Indictment.[4]

To date, co-defendants Brian Perry, Salvatore Bertino, Andrew Shomers, and Dominick Dellaccio have entered guilty pleas to the racketeering conspiracy charge enumerated in Count One of the Indictment, and may testify for the Government at the upcoming trial.  Co-defendants Anthony Cerrone, who was convicted of attempted extortion after a jury trial, and James McKeown, who pleaded guilty to attempted destruction of a motor vehicle in interstate commerce, may also testify for the Government at trial. Co-defendants Steven Markle, Andrew Tomascik, Jr., and Salvatore

---

[4]The Government is aware that in this District, defendants frequently waive their right to have the jury decide forfeiture and submit the issue to the Court for determination as part of sentencing.

Spatorico, have all been convicted of Indictment charges following either trial or guilty plea.

Former Local 91 members Robert Malvestuto, Jr., and Patrick McKeown pleaded guilty – before indictment – to racketeering conspiracy as part of the Government's continuing investigation in this case, and may also testify for the Government at trial.   The Government also obtained convictions via guilty pleas from former Local 91 members Robert Aleks (perjury), Anthony Fazzolari (theft or embezzlement from employee benefit plan), and Randall Butler (attempted extortion).

## II.   FACTS

The Indictment alleges that over a nearly seven-year period of time (1995 through 2002), the defendants engaged in a pattern of actual and threatened force and violence designed primarily to intimidate union and non-union construction contractors and employees.[5]   The Indictment further alleges that the defendants, using the Local 91 Criminal Enterprise, engaged in witness

---

[5]In its August, 2005 bill of particulars, the Government asserted that the enterprise continued beyond the 2002 period to include crimes organized by defendant CONGI in May, 2003, when the defendant sought to intimidate new officers of Local 91 through acts of property destruction.   This information is also summarized herein.

intimidation and other acts of violence and property destruction. In the case of CICERO, the Indictment charges that the defendant (aided and abetted by defendant CONGI) committed extortion through misuse of his position of Niagara Falls Bridge Commissioner (color of right extortion), as well as threatened economic harm to the victim. Because of the sheer magnitude of these incidents, only a brief summary of the most significant events to be introduced at trial is contained herein, highlighting the victims, location, and principal perpetrators.

**Attempted Extortion of Vulcan Shaw Floor and Louis P. Ciminelli Construction Companies, and Their Employees, 1995- May 1996, and Summer 1997[6]**

Louis P. Ciminelli Construction Companies ("Ciminelli") began building a Target store on Niagara Falls Boulevard[7] in approximately October, 1995. On numerous occasions during the course of the project, co-defendant Salvatore Bertino, the Local 91 steward on the project, demanded that Local 91 members be hired or

---

[6]Chronologically prior to this incident, the Government may introduce evidence that in March and April, 1995, BELLRENG damaged a van and automobile belonging to the Bullard Lindsay Contracting Company while a construction project was occurring at the Niagara Falls Airbase. Witnesses, including Barry Bullard, will testify BELLRENG also threatened non-union workers and damaged a wheelbarrow at this site, and that CELESTE was made aware of BELLRENG's conduct.

[7]Unless otherwise noted, all incidents occurred in Niagara Falls, New York.

used for tasks traditionally performed by other union tradespersons.

Thomas Redell, the construction superintendent for Ciminelli on the Target project, will testify that he refused Bertino's demands, and reported Bertino's belligerent conduct to CONGI and Dellaccio. On October 21, 1995, after Redell had refused Bertino's demand to hire additional, superfluous Local 91 workers (including Bertino's son), Redell discovered that all four of the tires on his truck had been slashed while the vehicle was parked in the driveway at his residence. Redell also observed that a fuel line from a propane tank used to heat two construction shanties at the Target project had been cut. Redell told both CONGI and Dellaccio that he believed Bertino was responsible for this conduct, yet no action was taken by CONGI or Dellaccio to remove Bertino from the Target site. Bertino will testify that he, in fact, damaged the tires of Redell's truck (and later, the tires of a truck belonging to the carpenter foreman, David Knapp[8]), and that CONGI was both aware of and approved of this conduct.

Redell, and Vulcan Shaw Floor ("Vulcan") employees Robert MacKellar and William Russell, will testify that, in approximately May, 1996 (the Target project was still ongoing), Bertino demanded

---

[8]The destruction of Knapp's tires occurred in April, 1996.

aspects of the work being performed by union carpenters from Vulcan relating to the installation of vinyl floor tiles (including sweeping, patching, mixing, unloading trucks, and other work). Redell, MacKellar, and Russell refused these demands because the work belonged to the union carpenters. Soon thereafter, on May 13, 1996, Redell, MacKellar, and Russell discovered that unknown persons had thrown six five-gallon pails of black tile adhesive on approximately 8,000 square feet of newly-installed vinyl tile, as well as in the toolboxes of Vulcan employees, and that the perpetrators had also thrown a floor sander into a nearby field.

Former co-defendants Shomers and Bertino, along with Local 91 member Joseph Gambino, will testify that they and Local 91 members Angelo Congi and Rico Liberale[9] committed the May 13, 1996 property sabotage at the Target project at the direction of CONGI. Gambino will further testify that he refused CONGI's request that he steal the Vulcan workers' tools, but acknowledged throwing the Vulcan floor sander into a field in the back of the Target site.[10]

_____

[9]The Government identified Gambino, Angelo Congi and Liberale as unindicted co-conspirators in its bill of particulars, dated August 3, 2005. Additionally, the Government noted that, in a pre-trial meeting with Gambino on August 16, 2005, Gambino did not recall Liberale being present at the May 13, 1996 incident. In addition, during a recent pre-trial meeting, Gambino stated that he recalls Anthony Bertino, who is co-defendant Salvatore Bertino's son, participating in the May 13, 1996 incident.

[10]The Government will supplement its proof on this and other incidents with aerial and crime scene photographs, minutes of Local

MacKellar and Russell will further testify that Vulcan performed carpet and soft tile installation at the Rainbow Bridge during a construction project in 1997. As before, the Local 91 labor steward on that project (unindicted co-conspirator Daniel Seriani) demanded aspects of Vulcan's work, including the unloading of trucks. The demands were punctuated by threats and violence, including an occasion when Seriani grabbed MacKellar's son (who was also working for Vulcan on this project) by the throat, and another occasion when CELESTE confronted MacKellar and told him that MacKellar was lucky he had not unloaded the truck at 6:00 p.m., when CELESTE had thirty laborers present on the site (to cause harm).

Finally, MacKellar and Russell will testify that, in approximately August, 1997, they met with they met with CONGI, CELESTE, Dellaccio and Seriani regarding aspects of work on the Rainbow Bridge project. CONGI, flanked closely by CELESTE and Dellaccio, attempted to physically intimidate Russell into relinquishing Vulcan's work by standing within inches of Russell and screaming and yelling obscenities at him. CONGI punctuated this intimidation with a series of threats such as "I am going to get you" and "We are going to get you." David Fay, a carpenter

_____

91 meetings, notes of the victims, and other items of physical evidence.

union official, will testify he witnessed some of this incident. Ultimately, Vulcan relinquished aspects of their work to Local 91 in order to maintain labor peace on the project.

**Extortion of Double J Fence Company, February 1997**

In late January and/or early February, 1997, John Miskovski and Jeff Depasquale, two New York State Troopers who also operated (while off duty) a small business known as Double J Fence ("Double J"), began erecting a custom wooden fence outside the Delta Sonic car wash on Niagara Falls Boulevard. As the work progressed, CONGI visited Miskovski at the site and told him the work had to be performed using union labor. When Miskovski declined, CONGI threatened to set up a picket line.

On February 9, 1997, Miskovski discovered that approximately two hundred feet of eight-foot high fence had been cut down, and a company vehicle sabotaged (flattened tires and substance placed into the gas tank). Mindful of CONGI's prior demands, Miskovski and Depasquale proceeded to the Local 91 union hall and accused CONGI and Dellaccio of cutting down the fence. Both defendants denied the accusation, and ceased yelling at the two victims only when co-defendant Michael "Butch" Quarcini entered the room. The meeting terminated when CONGI, Quarcini, and Dellaccio told the two

men they would be allowed to finish the project without using union labor, but only if Miskovski and Depasquale pay a sum of money equating to the cost of dues and benefits as if the victims were union members.

Miskovski will testify that, after the fence was cut down, he and Depasquale agreed to hire a laborer from Local 91. Mark Placek, a Local 91 member, will testify that CONGI sent him to work on the Delta Sonic project for Double J.

Shomers and Bertino will both testify that they, along with Local 91 members Liberale and Pat McKeown,[11] cut down the fence on orders from CONGI, in retaliation for Double J not using Local 91 union members for the job.

**Attempted Extortion of Mulvey Construction Company and Its Employees, December 1996 through Spring 1997**

Tim Mulvey, owner of Mulvey Construction Company, will testify that in late 1996, his company planned to construct a number of projects in Lockport, including the HSBC Bank at 144 Main Street, using non-union labor. Violence at the Main Street site commenced in approximately December, 1996, shortly after Mulvey told

---

[11]McKeown has been identified by the Government as an unindicted co-conspirator.

Dellaccio that Mulvey planned to use his own non-union employees, rather than union members, for the projects.

Mulvey, along with Robert Marotta, the project manager, and other Mulvey employees (Jason Thompson and John Lyon), will testify that Local 91 picketers variously screamed at, threatened and spit at the non-union Mulvey workers as they attempted to work at the job site.  When these tactics proved insufficient to stop the construction project, picketers escalated their attack by blocking entry and exit from the job site, striking employees' vehicles, throwing rocks and metal stars, punching employees, cutting fences, squirting glue into locks, slashing tires, placing false orders for supplies with Mulvey's suppliers, and trailing Mulvey and his employees.  CONGI, CELESTE, and Dellaccio will be identified as some of the Local 91 members present at the 144 Main Street picket line, along with unindicted co-conspirator Randall Butler, who on one occasion displayed a weapon (knife) in an attempt to intimidate the Mulvey employees.

Mulvey and Marotta will further testify that commencing in approximately January, 1997, as many as fifty union members periodically converged at the Mulvey residence for the purpose of shouting obscenities at Mulvey, his wife, and children, blocking the family from leaving, and engaging in conduct designed to

instill terror.  This barricade continued for at least a month, and caused one of Mulvey's teenage sons to suffer an emotional breakdown.  Mulvey's wife, who at the time worked as a care giver for terminally ill cancer patients (Hospice), had to curtail her activities for fear of the picketers.  The Government will prove that both ALBERT CELESTE and PAUL BELLRENG (along with other Local 91 members) participated in the picket at the Mulvey residence.[12]

Local 91 members and unindicted co-conspirators Ronald Mantell, Ed Carlo, David Wilson and Donald Connor may also testify to aspects of the Mulvey picket.  The Government may also introduce union business records demonstrating Local 91's role in the Mulvey attempted extortion.[13]

**Attempted Extortion of Sansla, Inc., and Its Employees, February through July 1997**

Sansla, Inc. ("Sansla"), a non-union, New Jersey-based contractor, was awarded a contract to perform asbestos removal work at the Drinking Water Treatment plant in January, 1997.  Sansla

_____

[12]The Government will also introduce videotape evidence from Mulvey and Local 91 depicting CELESTE, BELLRENG, Dellaccio, and others in front of the Mulvey residence on March 27, 1997.

[13]While several unions on occasion participated in the Mulvey picket, the Government's evidence will demonstrate Local 91's, and the defendants', joint responsibility for this act of extortion.

representative William Marggi will testify that on multiple
occasions thereafter, CONGI, CELESTE, Dellaccio, and unindicted co-
conspirator Cheryl Cicero telephonically contacted him and stated,
among other things, that work in Niagara Falls was done by union
people "or not at all," that "this was Niagara Falls and it was
their town," and that Sansla should sign a contract with Local 91
and leave their workers home.  On one occasion, after Marggi said
Sansla intended to use its regular employees, CELESTE stated that
if Sansla did not use their men and sign an agreement, they "would
do what they had to do."  CELESTE repeated the intimidating phrase
two or three times during this same conversation.

Sansla employees Goran Stevanovic and Peter Petrovic will
testify that they arrived in Niagara Falls in late March, 1997, and
that from the outset, Local 91 picketers utilized a variety of
tactics designed to drive them out of town.  These tactics included
following the Sansla workers, and cursing and threatening to injure
the workers and their families.  Local 91 members also blocked
entrances, threw objects (such as bottles, rocks, and welded metal
stars) at the Sansla workers, shot golf balls at the Sansla
workers, placed padlocks on the gates, and compelled the Sansla
workers to call for police assistance in order to safely escort
them through the Local 91 picket lines.

Multiple witnesses will testify that the persons directing, inciting and observing many of these incidents were defendants CONGI, CELESTE, BELLRENG.  In fact, numerous witnesses will state that the most aggressive Local 91 member at the Sansla site was BELLRENG, and that CELESTE was continuously observed at the site monitoring the picketers' actions.

Local 91 members also engaged in property destruction at both the job site and the Sansla workers' temporary residence, such as ripping the protective decontamination barrier shielding the asbestos removal site (BELLRENG), and flattening the tires and cutting the brake lines of the Sansla worker's truck (Shomers, CONGI, and others).

Commencing on April 21, 1997, Sansla began employing approximately 10 city residents to assist in the project, several of whom were Local 91 union members.  Petrovic and Stevanovic will testify that, when Sansla refused to hire BELLRENG, BELLRENG spoke to CELESTE at the latter's car, and then yelled to Stevanovic, while still in the presence of CELESTE, "I am coming tonight to get [take] your head off."  The Government will introduce a portion of a log book maintained by Stevanovic which memorializes that on this date, BELLRENG in fact threatened to murder Stevanovic.

Stevanovic and Petrovic will testify that, at approximately 11:30 p.m. on April 21, they and other Sansla workers were at their temporary residence at 53 Steele Circle in the Town of Niagara. Local 91 members Shomers, Cerrone, and Malvestuto, Jr., will testify that, acting at CONGI's direction, they and Local 91 member Randall Butler drove to the Sansla employees' temporary residence, stopping en route to pick up two explosives (M-80s or M-100s) and two bricks.  After the group attached the explosives to the bricks, the Local 91 members proceeded to the Sansla residence, where the explosives/bricks were thrown into the home and detonated. Stevanovic will testify that, beyond shrapnel and other property damage, he suffered permanent hearing loss as a result of one of the devices exploding near his head.

The Government will introduce numerous photographs, videotape, and a Sansla project log during its presentation of evidence relating to this event.  The Government will also seek to introduce records from Local 91, including handwritten notes of CELESTE confirming that he was present at the Sansla site, and/or engaged in other actions against Sansla, on the following dates:[14] March 26, 28, and 31; April 2 (with CONGI), 3 (with Quarcini), 4, 7, 8 (with CONGI), 9 (with CONGI), 10 (with BELLRENG), 11, 12, 14 (with BELLRENG), 15 (with BELLRENG), 16, 17 (with BELLRENG), 18, 21, 22,

---

[14]All of these dates were in 1997.

23, 24, 25 (with BELLRENG), 28, 29, and 30; May 1, 2 (with BELLRENG), 5, 6, 7, 8, 9, 12, 14, 15, 16, 17, 19, 20, 22, 23, 28 (with BELLRENG), 29, and 30; June 5, 6, 9, 10, 11, 12, 13, 16, 18, 19, 20, 23, 24, 25, 26, 27, and 30; and July 1, 2, 3, 7, 8, 9, 10, and 15.  The Government may also introduce an affidavit BELLRENG prepared for the National Labor Relations Board regarding aspects of the Sansla picket.

The Government may also introduce the testimony of police officer Michael Trane, who will identify a license plate number given to him by Mr. Petrovic as belonging to defendant CELESTE, and which license plate was on a vehicle which occasionally followed the Sansla employees.

**Attempted Extortion of Browning Ferris Industries and Serrot Corporation, and Their Employees, September 1997[15]**

In September, 1997, Browning Ferris Industries ("BFI") hired Serrot Corporation ("Serrot"), a non-union contractors based in

---

[15]Chronologically prior to the BFI/Serrot extortion, during the summer of 1997 (believed by the Government to be on or about July 3, 1997), CONGI drove Shomers, Cerrone, and Malvestuto to the Middleport Elementary School where non-union company Rusmar, Inc. (and other non-union companies) was performing renovation work inside the school.  Shomers and Malvestuto, acting at the direction of CONGI, entered the school and sabotaged property, including an airless spraying machine, three negative air machines, and an emergency generator.  Cerrone acted as a lookout while Shomers and Malvestuto entered the school to inflict the damage.

- 17 -

Nevada, to install a landfill liner at the BFI landfill located near the I-190 in the Town of Niagara. Prior to September 28, 1997, CONGI and Dellaccio demanded that BFI and/or Serrot employ Local 91 members for this task. When this demand was rejected, CONGI directed Bertino, Cerrone, Shomers, Malvestuto and Patrick McKeown to destroy the liner.

Bertino, Cerrone, Shomers, and Malvestuto will testify that, during the evening of September 28, 1997, they entered the BFI landfill site, used razor knives and other sharp objects to cut, slash, and otherwise damage the landfill liner (which resulted in approximately $100,000 of damage), and damaged a lighting generator/pole. McKeown and the other cooperating co-defendants will testify that McKeown drove the others to the landfill site and acted as a lookout. Later that same night, the co-defendants went to the motel where the Serrot workers were staying, and punctured the tires on the cars belonging to the workers (and other motel patrons).

BFI employee Dave Grenier, former Serrot employee Chris Fore, and the cooperating co-defendants will testify as to this incident, with the Government also introducing photographs and other items, including a welded metal "star," which Local 91 members used during

violent picketing at the site prior to the destruction of the landfill liner on September 28, 1997.

**Attempted Extortion of Hospitality Restoration Builders, Inc., and Servico, Inc., and Their Employees, Spring 1998**

In late March, 1998, Hospitality Restoration and Builders, Inc. ("HRB"), a non-union, out-of-state company, began renovations on the Clarion and Holiday Inn Hotels, operated by Servico, Inc. Servico employee Tom Rosati and HRB employee Raymond Iveys, along with Local 91 members Brian Perry and Ronald Mantell, will testify that, beginning in the first week of April, 1998, Local 91 set up picket lines, damaged cars, slashed tires, threw raw eggs and metal stars, and continuously abused those attempting to enter the hotel. The repeated incidents of violence and property destruction compelled workers on many occasions to await the arrival of police protection before crossing the picket line. Witnesses will identify CONGI as being in charge of the picket, as well as being behind the violence and sabotage, the goal of which was to drive the non-union employers and employees out of town.

Along with testimony regarding the continuous actual and threatened violence committed by Local 91 members, two specific instances of mayhem occurring on April 17, 1998, will be introduced. During the early morning hours, John Spiller, a truck

driver for Alliant Food Service, Inc., delivered a quantity of food products to the Clarion Hotel. Spiller had no connection whatsoever to the construction project.

Arriving at the Hotel at approximately 5:00 a.m., Spiller discovered Local 91 picketers beginning to amass. As Spiller unloaded his truck, picketers yelled comments such as "stop delivering," and "you're not coming out of there, driver." Spiller asked the hotel to contact the police for an escort, but the front desk clerk proposed that Spiller try to drive through the picket unaided by the police.

Upon entering his truck, Spiller observed about 20 picketers, and reported feeling uncomfortable. He locked all doors and windows, and slowly pulled the truck toward the picket line. Suddenly, at least five or six Local 91 picketers jumped on his truck, and started ripping off its mirrors, and banging on its windows and windshield. Spiller will describe the picketers as "animalistic," and will state that he believed that the picketers were trying to kill or severely harm him. Spiller blew his horn and started to drive through, at which time one of the picketers threw an object at him, breaking the window and hitting him in the nose. With blood streaming from facial wounds and glass everywhere, Spiller continued to drive, and observed that the

- 20 -

picketers were running after his truck.  Spiller eventually arrived at a nearby hospital, where he was treated for a broken nose and multiple lacerations.  Spiller was out of work for several days, and continues to suffer effects of the broken nose to this day.[16]

Raymond Iveys, an HRB employee at the Clarion Hotel, will testify that, on the same day as the Local 91 attack on Spiller, he and his uncle (Richard) were also attacked by Local 91 members. Iveys will testify that, from the beginning of the project, Local 91 picketers attempted to prevent him from entering the Clarion Hotel by stepping in front of him and yelling intimidating comments, including racial epithets.  Iveys will identify CONGI as the union boss who appeared to be in charge.

On April 17, 1998, Iveys and his uncle left the Clarion Hotel at approximately 12:00 noon, intending to walk to a nearby bank. As Iveys and his uncle exited the back door of the hotel, Local 91 picketers pursued them and shouted a variety of racial epithets. Both Iveys and his uncle ignored the picketers and kept walking; three Local 91 members, on the other hand, chased and surrounded them.  As one Local 91 member fought his uncle, two union members grabbed Iveys.  Iveys will testify that as he fended his attackers

---

[16]Co-defendants Spatorico and James McKeown have been convicted in connection with this attack.

- 21 -

off, his uncle was wrestling with his assailant on a truck near the parking ramp.  Iveys will state that the assailants abruptly broke off the attack, either because police were coming or the fact that Iveys had procured a pole with which to defend himself and his uncle.  Richard Iveys suffered facial cuts from this attack, and did not return to work that day.[17]

The Government will also introduce photographs and a videotape of the site, along with union documents including: an NLRB settlement stipulation signed by CONGI on behalf of Local 91; a bill to CELESTE for a bulk asbestos analysis of aspects of the HRB remediation work; a letter, dated April 10, 1998, notifying CONGI that union members were engaging in a variety of illegal activities at the site; notes of CELESTE regarding conduct of CONGI and BELLRENG; and photographs from April 24, 1998, depicting CONGI and numerous other Local 91 members engaged in a vehicular blockade of the hotels.

The Government will also introduce evidence that on Saturday, April 25, 1998, CONGI, CELESTE, BELLRENG, Dellaccio and Quarcini met with the Mayor of Niagara Falls, the acting Chief of Police of Niagara Falls, and the City of Niagara Falls Administrator at the

---

[17]James McKeown and Mark Lostracco, along with Local 91 member Joseph Lostracco, committed this attack upon the Iveys.

Local 91 union hall in an effort to have the police "take their time" and/or "take it easy" when persons seek police assistance at the hotel sites from actions committed by Local 91.

### Attempted Extortion of the Niagara Falls Housing Authority, July 1998

Thomas Wrobel, a former maintenance supervisor for the Niagara Falls Housing Authority, will testify that, on July 21, 1998, at approximately 2:00 p.m., he was contacted by a business agent named Mark (CONGI) from Local 91. CONGI asked Wrobel why his agency, located across the street from the Local 91 union hall, was using non-union workers to install a small section of concrete sidewalk adjacent to the Authority. CONGI stated that he would be establishing a picket line to protest the work.

Wrobel will say he discovered that persons unknown had damaged the Housing Authority during the evening of the same day he spoke to CONGI. Cooperating defendants Shomers and Bertino will testify that CONGI directed them to damage the Authority's property, which they did by entering the site, and puncturing the tires of a payloader, van, truck and trailer, and spray painting the Authority building and vehicles.

Fred Bidak, the owner of the company that was installing the concrete for the Authority, will testify that he was forced to pay Butch Quarcini the sum of $400 (representing initiation fees), in the hope of obtaining labor peace on this particular project.  The Government will introduce physical evidence consisting of photographs, as well as the testimony of Shomers and Bertino, to complete its proof on this incident.

### Attempted Extortion of E. G. Sackett Company, and Its Employees, Spring - September 1998

Commencing in Spring, 1998, Wegman's Corporation began building a grocery store on Military Road.  Wegman's hired E.G. Sackett Company, Inc. ("Sackett"), a union company based in Rochester, New York, to install the ceramic tile at the store. From the inception of the project, co-defendant Andrew Tomascik, labor steward on the project for Local 91, confronted and threatened a variety of tradespersons (including union carpenters, plumbers, and bricklayers) in an effort to obtain the work traditionally performed by those trades.

In approximately September, 1998, Sackett began utilizing its union tilesetters to install ceramic tile at the project.  During the week of September 16, 1998, Tomascik and Dellaccio demanded the

sweeping work traditionally performed by Sackett tilesetters as part of the ceramic tile installation.

Numerous witnesses will testify that, at approximately 9:00 a.m. on September 16, 1998, Lincoln automobiles owned by CONGI and Dellaccio, along with vehicles of other Local 91 members, entered Wegman's parking lot. A large number of Local 91 members (estimated to number between 12 and 30) exited the vehicles and gathered in the parking lot. The Local 91 members – including CONGI, BELLRENG, Dellaccio, Markle, Cerrone, Shomers, Perry, and Bertino – assembled briefly in the parking lot, and then descended upon and beat tilesetters Kyle Acel, Leon Carr, Jim Skidds and Ira Maney.[18] As the attack was carried out, Local 91 members yelled comments such as "this isn't Buffalo," "when you speak to a union man, you'd better say 'yes sir' and 'no sir,'" "you're going to get more of this if you stay in our town," and "this is our town, get out of here."

Each of the tilesetters suffered injuries and were taken to a nearby hospital via ambulance and/or automobile, with Acel being the most seriously injured (loss of feeling on side of face, severe

---

[18]CONGI and Dellaccio remained near their cars when the beatings commenced. One witness (Local 91 member Gambino) has identified CELESTE as remaining in Dellaccio's car during the attack.

pain in arm).   The Government will introduce evidence of witness identifications made in this case (CONGI, BELLRENG, and other Local 91 members), and will also call Local 91 participants in the attack to complete its proof on this attempted extortion.

### Attempted Extortion of Environmental Products and Services, Inc., and Environmental Quality Management, Inc., September 1998

In September, 1998, Environmental Products and Services, Inc. ("EPS"), a non-union asbestos removal company located in Syracuse, New York, served as a subcontractor to Environmental Quality Management, Inc. ("EQM"), for a multi-phase remediation project occurring at the former Lake Ontario Ordinance Works in Porter, New York.[19]   EQM employee Brian Spears will testify that, on September 10, 1998, CONGI, accompanied by two others, demanded that Local 91 perform the EPS work.   After Spears refused CONGI's demands, CONGI (and the other Local 91 members), left the site in a black Lincoln automobile.   Kevin Cannon, an EPS employee, will testify that CONGI made similar (and unsuccessful) demands upon him.

On September 13, 1998, CONGI directed Shomers and Bertino to destroy the equipment used by EPS and EQM at the Ordinance Works job site.   When both co-defendants declined, CONGI recruited

---

[19]Witnesses occasionally will refer to this site as the CWM site.

Malvestuto and Patrick McKeown for the task.  Both men traveled to the site and, while McKeown served as lookout, Malvestuto started a backhoe being leased by EPS and used the backhoe to destroy the other EPS construction equipment, as well as a construction trailer and decontamination unit.  Damage to the equipment was estimated to be approximately $200,000.

Jerry Zell, a member of a trade group, will testify that CONGI boasted to him about this incident (as well as the Sansla bombing incident occurring in April, 1997[20]).  Zell will also testify as to his observations of CELESTE and BELLRENG at trades meetings, and meetings of the Industrial Development Agency, respectively.

### Attempted Extortion of Ferguson Electric and Mader Construction Companies, and Their Employees, 1999-2000

In 1999 and 2000, the Mader Construction Company ("Mader") and the Ferguson Electric Company ("Ferguson") performed aspects of the construction project occurring at the Niagara Falls High School.  Representatives from both companies (Robert Braunscheidel, Harold Keller, David Felice, and Terry Tempest) will testify that Local 91 members persistently demanded aspects of the jobs being performed by their respective companies, employees of which were

---

[20]Zell will also testify that CONGI referenced damage to a liner, which could be a reference to the BFI/Serrot incident in September, 1997.

members of either the carpenters' union (Mader) or electricians' union (Ferguson).

As to specific acts of threats and/or violence regarding Mader employees, Harold Keller, the Mader superintendent on the project, will testify that CONGI and Dellaccio told him that the high school project "would not be done the same way as Wegman's."  Keller will testify that he interpreted this statement as a threat, as well as a reference to the fact that at the Wegman's project, carpenters successfully resisted demands by the laborers.

On March 31, 1999, fifty-six year old Robert Braunscheidel (a union carpenter for Mader) was sweeping an area near his work station in anticipation of snapping a line.  Shomers, along with another unidentified laborer(s), approached Braunscheidel and said "you are not a sweeper, that's not your job."  Shomers thereafter grabbed the broom from Braunscheidel and jabbed him in the stomach with the handle, causing Braunscheidel considerable pain.

Braunscheidel left the area and planned to report Shomers to the project superintendent.  As Braunscheidel walked toward the office, he was again confronted by Shomers, who this time pushed Braunscheidel with two hands in the chest, causing him to fall over and strike his head.  Braunscheidel suffered a concussion-type head

injury in the fall, compelling him to go to the hospital via ambulance for treatment.

Braunscheidel will also testify that, on May 3, 1999, Bertino demanded the sweeping work in the area where Mader was to install walls. On this occasion, Bertino threatened Braunscheidel by stating that if Local 91 did not perform this work, the laborers would not mix fireproofing, which in turn would result in a slowdown and de facto unemployment for two Mader plasterers.

Harold Keller will testify that, the day after this confrontation, he received a telephone call from Dellaccio, who put Butch Quarcini on the telephone. Adding to Bertino's demands to Mader employee Braunscheidel, Quarcini demanded from Keller that Local 91 now be given the job of taking power tools from the tool chest to the carpenters, as well as other tasks which carpenters universally performed. Keller refused this demand, at which time Quarcini threatened Keller with the statement that he would "do whatever the fuck he had to do." Keller will testify that he interpreted this statement as a threat of either physical harm or destruction of property if he did not accede to Quarcini's demands.[21]

---

[21]The Government may also introduce the minutes of Local 91 for September 8, 1997, wherein it was stated "Dom (Dellaccio) explained to the members that there are problems with the

Braunscheidel will also testify to other acts of work slowdowns, and actual and threatened property destruction, perpetrated by Local 91 members at the high school project, including an occasion when someone vandalized his car. Braunscheidel will testify that CONGI periodically sought to intimidate him,[22] that he observed CELESTE at the high school construction site, and that CONGI and CELESTE were present after Braunscheidel was attacked on March 31, 1999.

Regarding the extortion of Ferguson, Terry Tempest, a Ferguson foreman, will testify to many occasions when Local 91 members, including Bertino, attempted to extort aspects of jobs from Ferguson and its employees. Those confrontations included an occasion when as many as 40 Local 91 members confronted his employees over work. Examples of disputed tasks included carrying cardboard, sweeping, and many other tasks that electricians routinely discharge during the course of their jobs. Tempest will testify that he frequently observed CONGI meeting with Bertino at

---

Carpenters still, not only with our regular jobs, but also with the residential work." Another entry on this date indicates "Mark CONGI made comments on how important stewards were and hoped that more of our members would take notice of how and why our good stewards do the things they do."

[22]Braunscheidel, who worked in Niagara County since approximately 1970, will further state that CONGI tried to intimidate him on most, if not all, other projects where his company worked in proximity to Local 91 members.

the project and observed CONGI meet with Bertino and Shomers in a parking lot near Ferguson's place of business.

Fellow Ferguson employee David Felice will testify that, in May, 2000, he attempted to clean the electrical supply room inside the high school.  Felice asked a Local 91 foreman ("Joe") to help find a laborer to sweep up the room; when the promised help did not arrive, Felice started to sweep the garbage in the room to one side so that Felice could remove several pallets.

Felice will testify that as he commenced sweeping, Bertino entered the room and started screaming "that's our work."  Two Local 91 members thereafter arrived, one of whom (Shomers) took Felice's broom, broke it, and threatened and challenged Felice to a fight.  This altercation ended when several electricians came to Felice's aid, causing Shomers to withdraw.

Several minutes after this conflict ended, a group of approximately 15 Local 91 members, led by Bertino, and including Shomers and Bertino's son (Anthony), again confronted Felice.  They told Felice they were looking for him and threatened him.  This incident ended when the foreman interceded and broke up the laborers' group.

On June 5, 2000, Felice observed Bertino driving slowly several times around his truck while appearing to talk on a cellular telephone. When Felice had an opportunity to check his vehicle (approximately fifty minutes after his observations of Bertino), Felice discovered that all four of the tires had been punctured in the sidewalls. Electrician Dave Brant will corroborate Felice's testimony regarding the Bertino/Shomers incidents.

Finally, Gerald Zell, a business agent with the electrician's union, along with Tempest, will testify that during the Niagara Falls High School project, they met with Dellaccio and CELESTE in order to resolve the continuing tensions caused by Local 91. After this meeting, persons unknown entered the high school project over the ensuing weekend and burned to the ground the trailer used by the electricians.

**Attempted Extortion of Al Muto at the City Market, December/January 1999**

In 1999, Al Muto purchased the City Market Building on Pine Avenue, intending to improve the property as part of the city-wide Pine Avenue renovation effort. In an effort to save money, Muto intended to perform a single aspect of interior demolition work (removal of HVAC units) with a small crew of non-union workers.

When the demolition work commenced, Muto received a telephone call from CONGI, who asked why Muto gave Local 91's work to non-union workers.  Muto replied that this was a small job, to which CONGI stated, "we'll just have to do what we've got to do."  Butch Quarcini followed up with a similar telephone call to Muto, stating "we'll just have to take care of this."

Muto will testify that he interpreted both statements as threats that the defendants would attempt to harm his business unless he replaced his choice of workers with Local 91 members. Muto felt particularly fearful knowing of the defendants' reputation for violence, including the union's past conduct at the Wegman's project in September, 1998, as well as his knowledge of a willingness to harm family members of those with whom Local 91 has a dispute.

In late December 1999 or early January 2000, three non-union workers were inside Muto's building removing a HVAC unit.  The workers were deliberately working in the late evening, for fear of Local 91.[23]  Dan McGovern, one of the non-union workers, will testify that, at approximately 10:00 p.m., approximately ten Local 91 members, led by CONGI, arrived at the project and announced that

_____

[23]Workers also put plywood over the windows as a further precaution against Local 91 member scrutiny.

Butch Quarcini wanted them to picket the site.  McGovern thought
this statement was absurd as the remainder of the work at the
project employed union workers (including Local 91 members).  Muto
will state that he believes that Local 91 members intended to
either beat up the workers or vandalize Muto's property.  Indeed,
after leaving this project for the night, someone turned on the
sprinkler system, intending to cause substantial water damage to
the project.  Muto decided to abort further work on the project
following this incident.

Another of Muto's non-union workers, John Raymond, will
corroborate McGovern's testimony regarding Local 91's nocturnal
presence at the project.  Specifically, Raymond will testify that
McGovern dropped he and another man off at the project, locked them
into the job site, and told them not to open the door for anyone.
Several hours later, a number of men began to pound on the front
door, demanding to be let in and sounding angry.  Raymond tried to
ignore this demand, only to then hear a number of men banging on
the back door, also demanding to be admitted.  Raymond's co-worker
asked the men to identify themselves, but received no response.  A
period of time later, McGovern arrived, and told Raymond to pack up
and leave the work unfinished.

Codefendant Shomers will testify that he was one of a number of Local 91 members present during this late night extortion attempt, and that CONGI organized the union cohort and was present as well.

**Attempted Extortion of Oldcastle Precast, Inc., and Its Employees, May 21-22, 2001**

On May 21, 2001, Oldcastle Precast, Inc. ("Oldcastle"), a Rochester-based, union contractor arrived at the Niagara Falls Airbase to perform a several day, federally-funded construction project. The workers sent by Oldcastle were members of Laborers Local 435, which is based in Monroe County.

Karl Comfort, the Oldcastle foreman for the project, will testify that upon arrival, he was immediately approached by Shomers, together with a number of other men. Shomers informed Comfort that he was from Local 91, and he (Shomers) wasn't going to let them work. Comfort suggested that both he and Shomers contact their respective bosses, mindful that on the previous Friday, Comfort's supervisor (Skip Seaburg) had been told by Local 91 (Cheryl Cicero) that Local 91 wouldn't be sending any laborers to the project.

Comfort will testify that twenty minutes after this initial confrontation, Shomers returned and stated, "I can't let you work, and I have ten other laborers on the other side of the building who won't let you work here, either." Shomers added that with a telephone call, he could get a hundred picketers within five minutes. Several minutes later, Shomers appeared a third time, this time accompanied by a number of laborers who carried hammers in a menacing fashion, one of whom was particularly large, and also started to don leather gloves in a threatening manner. Shomers walked up to within a couple of inches of Comfort and repeated his demand that "you guys are not going to work here."

Because of these threatening statements and actions, Comfort retreated to where he was able to safely make a number of telephone calls to his employer, eventually being told during the afternoon that the Oldcastle employees could start work at the airbase.

The next day, just as the Oldcastle laborers were preparing to again commence work, Shomers returned to the site and demanded that the laborers sign dues check off cards before they would be allowed to work. One of the Oldcastle laborers, Napier Thomas, refused Shomers' demand, telling Shomers "this is extortion." Shomers responded with a number of racial slurs (Thomas is African

American) and threats.  Comfort defused the impending assault, and then called Local 91 to have Shomers taken off the job.

Instead of this remedy, CONGI arrived at the job site. Comfort will testify that CONGI told him that they (Local 91) take things seriously in Niagara County, and that Shomers was only doing what he was told.

### Attempted Extortion of Scrufari Construction Company and E & B Equipment and Furniture, Inc., July, 2001

Larry Ensminger, president and principal owner of E & B Equipment and Furniture Company ("E & B"), will testify that his company has signed collective bargaining agreements with Local 91 and two Carpenters Locals, and routinely employs members of these unions at a variety of construction projects.

Ensminger will testify that in July, 2001, E & B obtained a subcontract with Scrufari Construction Company ("Scrufari") to install corridor lockers, chalkboards, tack boards and a folding gym door at the Lewiston Porter Middle School.  For the first phase of the project, the removal of the existing lockers, E & B utilized Local 91 members.

Ensminger will relate that, on July 6, 2001, certain products his company was to install at the school started to arrive, and that he planned on using union carpenters for the work (assembly and transport of lockers). Ensminger was advised by his superintendent, Mike Ciurzynski, that Local 91 demanded the carpenters stop working, and that all transport work was to thereafter be performed by Local 91.

Ensminger will testify that there was no reason for there to be any disagreement with Local 91 at the Lewiston Porter school project because it was universally recognized that the work in question was to be performed by carpenters. Accordingly, Ensminger called CONGI and told him that the disputed work was going to be done by carpenters. CONGI replied, "we have a way to get even," which Ensminger took as a direct threat to either damage the company's property or injure its employees if he did not replace the carpenters with Local 91 members.

Ensminger will also testify that CONGI implied during the conversation that E & B might be able to obtain a measure of labor peace if he put on two additional laborers, a request which Ensminger also declined because these workers would have had nothing to do, and were therefore unwanted and superfluous.

E & B superintendent Mike Ciurzynski will confirm Ensminger's testimony that members of Local 91 started a dispute with him over the movement of lockers.  According to Ciurzynski, CONGI called him on the telephone during the dispute and threatened him by saying "if you want a problem we can settle it quickly, I can have 20 guys there in a few minutes."  Ciurzynski will testify that he interpreted CONGI's statement to be a threat that Local 91 would injure the carpenters or the E & B property if he did not replace the carpenters with laborers, which Ciurzynski did not agree to do because the work properly belonged to the carpenters.[24]

Kevin Campbell, a supervisor for Scrufari, will testify that he was responsible for the overall supervision of work at the Lewiston Porter school project.  Campbell will testify that from the inception of the project, Local 91 members, including Bertino, engaged in numerous unauthorized work stoppages in order to attempt to force him to assign laborers to other trades' work.  Campbell will testify that Bertino disappeared for hours at a time without telling Campbell when or where he was going, but would claim that he was doing union work.

---

[24]Ciurzynski will also testify that he had a confrontation at the Niagara Falls High School with CONGI, Bertino and Reno Villella, after which lockers which his company was to install were damaged.  Ensminger will relate his own confrontation with CONGI regarding the same lockers, during which CONGI threatened "you carpenters want to play tough, we can have 12 laborers here in minutes."

Campbell will also testify that he was initially afraid to discipline Bertino due to a fear of retribution from Local 91, including property damage and assaults by carloads of Local 91 members.  Campbell also observed Bertino drive by his house during the evening hours on three different occasions, which Campbell interpreted as a threat to injure his family members.

On yet another occasion, Bertino and CONGI tried to force Campbell into assigning carpenter work (removal of walls) to Local 91.  To emphasize this demand, Bertino began to swear at Campbell and to attempt to physically intimidate him.  Campbell will also testify that CELESTE tried to intimidate him on occasion, including August 2, 2001, when Campbell documented this contact with a handwritten note.

Scrufari president Larry Sankes, who was present during the dispute with Local 91 at the Lewiston Porter Middle School, intended to side with Campbell on his jurisdictional decisions. Sankes and Campbell will both testify that on one occasion, Bertino told Sankes, while standing alongside CONGI, "you don't know who you are talking to.  I come from a different part of the world, a different country.  I'll take care of you."  Sankes will testify that during this diatribe, Bertino said that he was from Sicily, while CONGI mentioned to Bertino that he should file a complaint

against Sankes with the Department of Labor because Sankes was threatening his job.   Both Campbell and Sankes will testify that they took these statements to be threats that either they or their company would be harmed if they did not replace carpenters with Local 91 members.

Tobin Gormley, an employee of Scrufari and a union carpenter, will testify that while he was working at the Lewiston Porter school, he observed a member of Local 91 (Bertino's son) carrying his circular saw in an attempt to take over Gormley's work. Gormley retrieved the saw after a struggle and wrestling match. Approximately 15 minutes later, Bertino approached Gormley and threatened him, saying "you mtoher f-, you f- mother f-, the fun doesn't begin until the feds leave."

Sankes eventually decided to fire Bertino following another incident of physical confrontation during which Bertino took a swing at Sankes and swore at him.   Local 91 replaced Bertino with Shomers, an event which Campbell will testify did nothing to stop the problems on the job site with Local 91.   In one incident, Shomers demanded that a tilesetter not sweep an area, and to enforce this demand, grabbed the tilesetter, took his broom, and broke it in half.   On another occasion, a cement mixer that had

been used the previous day by a Local 91 member was damaged when sugar was put into its tank.

Campbell kept a diary of the conflicts with Local 91, which the Government will seek to introduce as identification-type evidence.

Ensminger will testify that, based upon his experience, Local 91 members "are nothing more than a bunch of thugs," and their extortionate acts routinely drive up the cost of doing business in the County by 25% to 30%.[25]

**Extortion of ProServe Corporation, September 2001 through April, 2002**

During 2000, ProServe Corporation (a Denver-based corporation owned by Joseph Aragon) entered into an agreement with Duty Free International (DFI) to construct and operate three restaurants (KFC, Pizza Hut, and Taco Bell) at the Lewiston-Queenston Bridge in Niagara Falls, New York.  DFI at that time already operated a retail store at the bridge based on a contract with the Niagara

---

[25]Also in 2001, Tim Maerten, the owner of non-union landscaping business, will testify that he was threatened by Local 91 member PAUL BELLRENG during work performed at the Tuscarora Village mobile home park in June, 2001, as a result of which threats (and other information) Maerten stopped working on the project.  Maerten will also testify that he identified Bellreng via a photographic array.

Falls Bridge Commission, which in turn managed the Lewiston-Queenston Bridge and its property.   To build the restaurants, ProServe/Aragon hired Kulback's Construction, Inc., a local non-union construction company, as the general contractor.

Construction began on the project in early September 2001.  On or about September 24, 2001, Tom Daniels, president of DFI, contacted Aragon and told him that JOEL CICERO, an official with Local 91 and a commissioner on the Bridge Commission, was unhappy because the project was not using laborers from Local 91.  Daniels instructed Aragon to contact CICERO and solve the problem.

Aragon will testify that he called CICERO, and told him he was unaware of any union requirement on the Bridge project.  CICERO responded that "somebody messed up," and told Aragon he did not want to discuss the issue on the telephone, but rather at the union hall.  CICERO also warned that the meeting should take place as soon as possible, both because CICERO would not let the project go forward, and CICERO did not want any "trouble" to happen.  According to Aragon, although no "trouble" had occurred up to that point, CICERO predicted that trouble "was imminent and [that] he was holding it off until [they] could sort these things out."  CICERO arranged to meet with Aragon early the following week at the Local 91 union hall.

In the meantime, Aragon spoke to Brian Kulbacki of Kulback's Construction, who educated Aragon about tactics used by Local 91 on construction projects in the area.  Before going to the meeting, representatives from DFI told Aragon to placate CICERO and "give him something" because the issues with Local 91 could lead to contractual problems with the Bridge Commission.  DFI also later indicated that it would cover the additional labor costs by giving ProServe an extra $100,000 (an amount which became insufficient upon future demands of CONGI).

On October 2, 2001, Aragon went to the Local 91 union hall along with the ProServe construction manager, Richard Jasper. Aragon will testify that CICERO was seated behind a desk when he arrived and that a short time later, CONGI entered the room, shut the door, and approached the area where Aragon and Jasper were sitting.  During the ensuing conversation, CONGI remained standing in an intimidating manner about three feet from Aragon and Jasper, with his arms folded, except for occasions when CONGI leaned toward the men and said the project would not go forward without Local 91 labor.

CICERO also said during the meeting that "it was a given that union labor was going to be used on the contract and somebody messed up with the Bridge Commission staff."   CICERO further

stated, in sum and substance, that "it can't go on like this, it's going to have to be as the Bridge Commission contemplated it would be and that's using union labor."[26]  When Aragon told CICERO that they were using union employees for some aspects of the project, CICERO responded that the company was not using "our union people," referring to Local 91.  CICERO additionally stated that the Bridge project would not go forward without Local 91 laborers.  Finally, in reply to a question from Aragon as to whether CICERO had a "conflict of interest" because he occupied the dual role of Local 91 official and member of the Bridge Commission, CICERO responded probably, but said he was loyal to Local 91, Local 91 was CICERO's "bread and butter" and "family," and that because he had the power (both with the Bridge Commission and Local 91, where CICERO was an officer), he might as well use it.

Aragon will testify that, over the course of the meeting, CONGI interjected several threats, including statements to the effect that "nothing gets built on Local 91's turf without laborers from Local 91."  CONGI also stated that "a couple things have been built [without Local 91 laborers], but they paid for it along the

---

[26]If called, Vic Montalbo, the Treasurer for the Niagara Falls Bridge Commission, will testify that the Commission did not require union labor on any aspect of the Bridge project and that CICERO was not acting on behalf of the Commission when he had this meeting with Aragon.  Additionally, none of the contracts relating to the Bridge project required union labor.

way," and gave as a specific example a hotel project in Niagara Falls from approximately five years earlier (i.e., the approximate time frame of the Clarion and Holiday Inn Hotel renovation projects). In this instance, CONGI stated that "it wasn't easy for them and it still isn't," saying Local 91 still goes back to the hotel at least once a year "just to bust their chops." CONGI also stated that, if Local 91 laborers were not used in the Bridge project, Aragon's operation would not survive because "that crossing is primarily a commercial crossing and all the truck drivers are Teamsters and he said if we tell them not to stop they won't stop and you'll be out of business without those guys stopping." During these portions of the conversations, CONGI was standing over Aragon and Jasper, and pointing at them in an intimidating manner. Aragon will testify that he believed CONGI possessed the power he claimed.

CICERO, CONGI, and Aragon ultimately agreed that the Bridge project would employ one Local 91 laborer per shift at the project. Aragon will testify that he entered into this arrangement in an effort to get the project completed (because he knew that he needed to resolve the problem in order to continue with DFI) and to avoid problems with Local 91. CICERO promised that there would be no further problems if Aragon followed through with this agreement.

DFI later agreed to pay up to $100,000 to cover any additional labor costs.

After the meeting with CICERO and CONGI, construction re-commenced at the Bridge project.  On about October 24, 2001, Aragon received a call from DFI and was informed that members of Local 91 were picketing the Bridge project.  Immediately thereafter, Aragon spoke with Brian Kulbacki, who indicated that CONGI was picketing the site along with about a dozen laborers.  Kulbacki will testify that he told CONGI (who was sitting in his black Lincoln with the window rolled down a few inches) that they were fulfilling an agreement to use laborers, to which CONGI responded "we want it all."  Aragon also will testify that he observed Local 91 picketers, along with an inflated, 30-foot rat.

Tom Daniels, the DFI president, will testify that on one occasion during a presentation to the Bridge Commission, CICERO inquired whether the project would be union.  Daniels replied that he did not know, and that such a decision was not within his control in any event.

**Niagara University, December 2001 through January, 2002**

Harold Keller, Mader superintendent who will also testify relative to the Niagara Falls High School conflicts with Local 91 (set forth above), will further state that on or about January 28, 2002, CELESTE demanded from Mader all of the work relating to the rigging of trusses at the Niagara University construction project. Although Keller will testify that this work properly belonged to carpenters, Keller relinquished this work because he feared retaliation by Local 91.

### OTHER EVIDENCE AS TO EXISTENCE OF THE ENTERPRISE

**Documents and Sightings**

The Government possesses a quantity of records that it will seek to introduce as evidence of the racketeering conspiracy. Most of this documentary evidence will be introduced through a Custodian(s) of Records from various business entities, including Local 91.

In sum, the documentary evidence includes:

- Local 91 LM-2s reflecting that CONGI, CELESTE, and CICERO were officers of the union, and that co-conspirators from time to time would be awarded with appointments to officer positions;

- Local 91 meeting minutes reflecting that CONGI, CELESTE, CICERO and BELLRENG all voted to benefit themselves and their coconspirators, including but not limited to the authorization to pay the towing fees for those arrested on picket lines; paying for out-of-town trips; participating in the purchase of new vehicles (including union vehicles used during extortion attempts);

- Local 91 meeting minutes reflecting the knowledge and participation of CONGI, CELESTE, CICERO and BELLRENG at various sites and/or regarding various victims involved in the instant case;

- a photograph of various co-conspirators taken during the Local 91 Charity Golf Classic; and

- various National Labor Relations Board and Court documents depicting knowledge that various activities was engaged in by the defendants and their conspirators, and that such was illegal.

The Government will further introduce evidence that on two occasions in October, 2002, CELESTE, "Butch" Quarcini, and several other Local 91 members appeared in Town of Wheatfield Court during a local prosecution of Bertino and two other Local 91 members.  At the time, the defendant Local 91 members were being prosecuted for committing an act of violence at a road construction project. Following the second local Court appearance involving Bertino and the two Local 91 codefendants, the Niagara County Sheriff's Department Investigator assigned to assist the District Attorney will testify that the same Local 91 members who were inside the courtroom, followed he and the Assistant District Attorney as they left the courthouse parking lot in the investigator's car.

The Government will also introduce photographs of various Local 91 members who are co-conspirators in this case, including the defendants, such photographs to be identified by witnesses during the trial.

**Assault at Gagster's Bar, November 24, 1999**

If called, Local 91 member Larry Renda will testify that on November 24, 1999, he received a telephone call from CONGI telling him to come to Gagster's "immediately," reportedly because CONGI was having trouble with a couple of guys.  When Renda arrived, he

observed approximately 8 to 10 Local 91 members, including CONGI, Shomers, Bertino, Markle, and George Johnson.   Before Renda knew what was happening, a small-ish, 30-year-old man, whom Renda recognized as an area businessman, left the bar, and was confronted by CONGI, Shomers, and Bertino.   Before the man could run back to Gagster's, CONGI punched the smaller man (Art Jocoy) a few times. Renda stated that the victim did not press charges because he was afraid of Local 91.   CONGI later told Renda he attacked the man because he had supposedly made lewd comments to a waitress at the bar.[27]

Jocoy, the assaulted victim in this case, said that CONGI must have overheard him and his friends talking about mildly offensive topics (regarding the bathroom), although he himself did not utter any such remarks and they were not directed toward anyone in the bar.   Jocoy said that when he left the bar with his wife, seven or eight males, including CONGI, surrounded Jocoy, accused him of insulting CONGI, and then punched Jocoy in the face.   One of the other assailants also punched Jocoy, while others in the group started kicking and punching him in the back, chest and groin.

---

[27]On a more general note, Renda, along with Shomers and other Local 91 members, will testify that in the mid-1990s, CONGI told them that the union needed a "strong-arm," and that he (CONGI) intended to be that man.

Jocoy's wife managed to escape and re-enter the bar, where she called for help from police and the bar owner, Tony Gagliardi.

In addition to suffering facial and chest injuries in the physical assault, Jocoy stated that all four tires on his pick-up truck were punctured, a fact that will be confirmed by testimony from Gagliardi.  Jocoy stated that he elected not to pursue charges against the assailants because he did not want Local 91 to hurt his local collision business.

Shomers and Bertino may also testify relative to this incident, as will bar owner Gagliardi.

**Incident at Denny's Restaurant, 1999**

Renda will testify that in approximately 1999, he told CONGI he was having a problem with the ex-boyfriend of his teen-age daughter, and asked if CONGI would be able to scare the boyfriend for him.  CONGI said that he would get Shomers or Bertino to do something about it, because he always used these guys to "do his dirty work."  A day or two later, CONGI called Renda for a description of the boyfriend, and reported that he and Shomers were outside the boyfriend's place of work (a Denny's Restaurant) and wanted to be sure of the identity of their target.

**Destruction of Vehicles of Local 91 Officers, May 2003**

In approximately May, 2003, CONGI asked Shomers and Bertino to sabotage the vehicles of the persons working for the trustee of Local 91.  After they declined, CONGI directed Local 91 member Louis Fazzolari to go to the home of three of the newly-appointed officers of Local 91 (Robert Connolly, Randy Tagliarini, and Rico Liberale) and damage the tires on their vehicles.  On or about May 24 and 27, 2003, Fazzolari and Local 91 member John Bianco, along with Mark Cocco, punctured the tires on vehicles belonging to Connolly, Tagliarini, and Liberale.[28]

**Obstruction of Grand Jury investigation**

Numerous Local 91 members, including Shomers, Cerrone, Bertino, Perry and others will testify that CONGI, on numerous occasions, repeatedly tried to thwart the federal Grand Jury investigation resulting in the instant Indictment, and additionally attempted to prevent the co-defendants and witnesses from cooperating with federal agents and prosecutors.

---

[28]Fazzolari, Bianco and Cocco will testify that Fazzolari and Bianco remained in their respective cars while Cocco, who had been driven to the officers' homes by Fazzolari and Bianco, punctured the tires of the officers' cars.

### III.  <u>APPLICABLE LAW</u>

Count One charges all of the defendants, with the exception of CICERO, with racketeering conspiracy.  Title 18, United States Code, section 1962(d) provides:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (c) of this section.

Section 1962(c), meanwhile, prohibits

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern or racketeering activity....

Count One identifies multiple specific predicate acts committed by various defendants; the Government in its various submissions, including a Bill of Particulars and Supplemental Bill of Particulars, has identified additional racketeering acts as well.  Nevertheless, it is <u>not</u> necessary for each defendant to be convicted of two or more of the predicate acts in order to be found guilty of Count One.

At one time, the Second Circuit required the Government to show that each defendant agreed to participate in conducting the affairs of the enterprise through at least two predicate crimes. <u>See</u> <u>United States v. Alkins</u>, 925 F.2d 541, 555 (2d Cir. 1991);

United States v. Bagaric, 706 F.2d 42, 62 n.17 (2d Cir.), cert.

denied, 464 U.S. 917 (1983).


The Supreme Court, in Salinas v. United States, 522 U.S. 52

(1997), rejected this approach.   Providing beneficial guidance on

many aspects of racketeering (and conspiracy) law, the Court held

that a conviction under this provision will be sustained so long as

the defendant:

> adopt[s] the goal of furthering or facilitating the
> criminal endeavor.  He may do so in any number of ways
> short of agreeing to undertake all of the acts necessary
> for the crime's completion. One can be a conspirator by
> agreeing to facilitate only some of the acts leading to
> the substantive offense... It makes no difference that
> the substantive offense under subsection (c) requires two
> or more predicate acts.   The interplay between
> subsections (c) and (d) does not permit us to excuse from
> the reach of the conspiracy provision an actor who does
> not himself commit or agree to commit the two or more
> predicate acts requisite to the underlying offense.

522 U.S. at 65.


As both predicate acts of racketeering and as substantive

counts in the Indictment, each defendant is accused of violating,

and attempting to violate, Section 1951 of Title 18 of the United

States Code.   That section, in pertinent part, provides:

> Whoever in any way or degree obstructs, delays, or
> affects commerce or the movement of an article or
> commodity in commerce, by ... extortion or attempts or
> conspires so to do, or commits or threatens physical
> violence to any person or property in furtherance of a

plan or purpose to do anything in violation of this
section [commits a crime].

As expressed in L. Sand, et al., Modern Federal Jury
Instructions, Form Instructions 50-8 (2003):

> Extortion is the obtaining of another person's
> property or money, with his consent when this consent is
> induced or brought upon through the use, or threatened
> use, of force, violence or fear.
>
> In order for the defendants to have obtained the
> property of another there must have been a transfer of
> possession of, or a legal interest in, that property from
> that other person to the defendant or a designee of the
> defendant.

Form Instructions 50-9, meanwhile, states that:

> In order to meet its burden of proving that the
> defendants committed attempted extortion, the government
> must establish beyond a reasonable doubt each of the
> following elements:
>
> First, that the defendants attempted to wrongfully obtain
> the property of another;
>
> Second, that the defendants attempted to obtain this
> property with the victims' consent, but that this consent
> was compelled by the wrongful use or threat of force,
> violence, or fear; and
>
> Third, that, as a result of the defendants' actions,
> interstate commerce, or an item moving in interstate
> commerce, would have been delayed, obstructed, or
> affected in any way or degree.

The term "property" includes money and other tangible and
intangible things of value. L. Sand, et al., Modern Federal Jury
Instructions, Form Instructions 50-11 (2003). In considering

whether the defendants used, or threatened to use force, violence or fear in order to obtain property, the jury should be instructed that the use or threat of violence does not have to be directed at the person whose property was taken, or can be aimed at causing economic rather than physical injury.   L. Sand, et al., Modern Federal Jury Instructions, Form Instructions 50-12 (2003).

A "threat" may be made verbally or by a physical gesture, and whether a statement or physical gesture by the defendants actually was a threat depends upon the surrounding facts.   Id.   As articulated by Courts in this Circuit, a threat sufficient to constitute extortion may be implied or express, and need not be conveyed with words; a jury may infer a threat from mere presence or proximity to the victim and co-defendants.   See, e.g., United States v. Thai, 29 F.3d 785, 819 (2d Cir. 1994).

"Fear" exists if at least one victim experiences anxiety, concern, or worry over expected personal harm or business loss, or over financial or job security.   The existence of fear must be determined by the facts existing at the time of the defendants' actions.   L. Sand, et al., Modern Federal Jury Instructions, Form Instructions 50-13 (2003).

The concepts memorialized in L. Sand, et al., are specifically endorsed by reported decisions from the Second Circuit Court of Appeals and elsewhere.  For example, in DeFalco v. Bernas, 244 F.3d 286, 313 (2d Cir. 2001), the Court stated

> Under the Hobbs Act, "[t]he term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Extortion through threats of economic loss falls within the Hobbs Act's prohibitions. Extortion may therefore be established on a theory that activities amounted to extortion by wrongful use of fear of economic loss.
>
> In this Circuit, "[t]he cases interpreting the Hobbs Act have repeatedly stressed that the element of 'fear' required by the Act can be satisfied by putting the victim in fear of economic loss."  The absence or presence of fear of economic loss "must be considered from the perspective of the victim, not the extortionist; the proof need establish that the victim reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment."

(internal citations and footnote omitted).

Of additional importance to this trial, wherein certain of the defendants were not always present at the scene of the attack, the jury must be instructed that "it is unnecessary for the government to prove that the defendant himself actually created the fear in the minds of his victims.  Rather, as the Court in Callahan v. United States, 223 F.2d 171, 174-176 (8th Cir.1955) held, *the exploitation of the victim's reasonable fear constitutes extortion regardless of whether or not the defendant was responsible for*

*creating that fear and despite the absence of any direct threats.*"
U.S. v. Lisinski, 728 F.2d 887, 891 (7th Cir. 1984)(italics in
original).

Case law is also clear that "the government d[oes] not have to
show either that the fear was a direct consequence of the threat of
economic loss," or that the victim personally feared the defendant.
Id. (citing United States v. Quinn, 514 F.2d 1250, 1266-67 (5th
Cir. 1975)). "Subtle extortions are covered under the Hobbs Act,
and the government satisfie[s] its burden of proof if it show[s]
circumstances surrounding the alleged extortionate conduct that
rendered the victim's fear of threatened loss reasonable." Id.

In determining whether a victim's fear was reasonable, the
defendant's reputation is a factor to be considered. "Bad
reputation is relevant to the fear element in a Hobbs Act
conspiracy 'since such a reputation frequently conveys a tacit
threat of force.'" United States v. Mulder, 273 F.3d 91, 103 (2d
Cir. 2001)(quoting United States v. Tropiano, 418 F.2d 1069, 1081
(2d Cir. 1969)).

As additional predicate acts of racketeering within Count One,
the Indictment also alleges violations of the New York State
extortion statute. New York State Penal Law §155.05(20(e)(I) and

(ii), provides, in pertinent part,

> Larceny includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subdivision one of this section,[29] committed in any of the following ways:
>
> (e) By extortion.
>
> A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
>
> (I) Cause physical injury to some person in the future; or
>
> (ii) Cause damage to property.

In proving the element of fear, "it is not essential that a defendant create the fear existing in the mind of his prospective victim so long as he succeeds in persuading him that he possesses the power to remove or continue its cause, and instills a new fear by threatening to misuse that power as a device to exact tribute." People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 877 (N.Y. 1960). A fear of future economic harm is sufficient to establish extortion. Dioguardi, 203 N.Y.S.2d at 877; People v. Capparelli, 603 N.Y.S.2d 99, 105 (N.Y.Sup. 1993).

---

[29]Subdivision one provides that "[a] person steals property and commits larceny when, *with intent to deprive another of property or to appropriate the same to himself or a third person*, he wrongfully obtains such property from an owner thereof." (Italics supplied).

Similarly, New York State courts have described it as "'immaterial' to the crime of extortion whether a threat is of things to be done or omitted by the offender, or by any other person." Dioguardi, 203 N.Y.S.2d at 877. In Dioguardi, the Court further stated that

> No precise words are needed to convey a threat. It may be done by innuendo or suggestion. To ascertain whether a letter (or oral proposal) conveys a threat, all its language, together with the circumstances under which it was written (or spoken), and the relations between the parties may be considered, and if it can be found that the purport and natural effect of the letter (or oral proposal) is to convey a threat, then the mere form of words is unimportant.

Id. at 878 (citing People v. Thompson, 97 N.Y. 313, 318, 1884 WL 13934 (1884)).


Finally, "evidence of the defendant's assaults, reputation for violence and of his self-proclaimed ties to organized crime [is] properly admitted as contributing to the credibility of his threats and of the victims' fear that they would be realized." Capparelli, 603 N.Y.S.2d at 105.


As described above, CICERO is accused of committing extortion under "color of official right," as well as aiding CONGI's extortion of Aragon/ProServe through fear, an additional means by which conduct may be punished by Title 18, United States Code, Section 1951. To establish extortion under color of right, the

- 61 -

Government must prove that a "public official obtained a payment to which he was not entitled," and "that the public official had knowledge that the payment was made in return for official acts." Evans v. United States, 504 U.S. 255, 268 (1992); see also, United States v. Middlemiss, 217 F.3d 112, 117 (2d Cir. 2000); United States v. Delano, 55 F.3d 720, 731 (2d Cir. 1995). Under most circumstances, this so-called "quid pro quo" requirement is satisfied where the government demonstrates the existence of an express or an implied criminal agreement. Evans, 504 U.S. at 274 (Kennedy, J., concurring) ("The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods"); accord, United States v. Garcia, 992 F.2d 409, 414-15 (2d Cir. 1993).

The remaining substantive criminal charge (Count 14) contained in the Indictment (as well as a sub-predicate act of racketeering in Count One) consists of Interstate Travel in Aid of Racketeering. Title 18, United States Code, Section 1952(a) provides:

> Whoever travels in interstate or foreign commerce ... or uses any facility in interstate or foreign commerce, with intent to-
> ...
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform-
> ...

(B) an act described in paragraph (2)[any crime of violence] shall be ... [punished].

In the instant case, the crime of violence encompassed within this Count is the extortion of Aragon/ProServe, while the interstate travel element consists of Aragon's travel from Colorado to Niagara Falls to attend the meeting with CICERO and CONGI on October 2, 2001.

As described above, the Government will seek to introduce the pre-trial identifications (oral, as in identifications told to agents, and also written, as identifications contained in notes and other documents) made of the defendants by its witnesses. A prior identification of a defendant is admissible under Rule 801(d)(1)(C), regardless of whether the witness confirms the defendant's identification in court. See United States v. Salameh, 152 F.3d 88, 126 (2d Cir. 1998). In addition, "[a] witness who identified a defendant prior to trial may make an in-court identification of the defendant if: (1) the procedures giving rise to the pretrial identification were not unduly suggestive; or (2) the in-court identification is independently reliable, even though the pretrial identification was unduly suggestive." Id. Moreover, the Government may use photographs, descriptions, or sketches to attempt to refresh a witness's recollection of the defendant whom he had initially perceived. Id. at 126; U.S. v. Marchand, 564 F.2d

983, 996 (2nd Cir. 1977).  Finally, the Government can use a photo
for recollection purposes provided there is a foundation for
believing that the witness once had knowledge of the fact as to
which his recollection is to be refreshed.  Id.

Regarding possible defense issues, in the event defendant
argues he was unaware his conduct was criminal, the Government will
request the Court instruct the jury that both the Supreme Court,
and this Circuit, adhere to the rule that ignorance of the law is
no defense to a criminal charge. See Cheek v. United States, 498
U.S. 192, 199 (1991); United States v. Durrani, 835 F.2d 410, 422
(2d Cir. 1987) ("It is well settled that ignorance of the law or
mistake as to the law's requirements is no defense to criminal
conduct").

During extensive pre-trial litigation, counsel for the
defendants sought dismissal of the counts relating to extortion
from the Indictment under United States v. Enmons, 410 U.S. 396
(1973), arguing that the defendants were pursuing legitimate labor
union objectives when they engaged in the conduct underlying the
charges in this case and, therefore, have a valid claim-of-right
defense.

In rejecting the defendants' arguments, this Court held that Enmons does not shield the defendants from Hobbs Act liability in this case.  This Court specifically held that the Enmons claim-of-right defense does not extend to violence or threats used to settle disputes between employees from one union and those from another (Decision and Order, dated 1/16/04, at 11-12), and, in any event, the defendants were not pursuing legitimate labor objectives when they engaged in the conduct underlying the charges in this case (Decision and Order, dated 1/16/04, at 12-16).  In addition, this Court found that the Enmons claim-of-right defense does not apply to extortion committed under color of official right (Decision and Order, dated 1/16/04, at 17-18).

Considering this Court's holding, the Government submits that the defendants are barred from pursuing the claim-of-right defense under Enmons at trial.[30]

Finally, relying on Scheidler v. National Organization for Women, Inc., 537 U.S. 393 (2003), the defendants also sought

---

[30]The Government also submits that the New York State Penal Law violations set forth as racketeering acts in Count One are not subject to a claim-of-right defense. See People v. Reid, 69 N.Y.2d 469, 476, 515 N.Y.S.2d 750, 752-53 (N.Y. 1987); People v. O'Hanlon, 252 A.D.2d 670, 672, 675 N.Y.S.2d 404, 406 (3d Dep't 1998); People v. Hodges, 113 A.D.2d 514, 518, 496 N.Y.S.2d 771, 774 (2d Dep't 1985); People v. Coates, 64 A.D.2d 1, 10, 407 N.Y.S.2d 866, 871 (2d Dep't 1978); People v. Banks, 55 A.D.2d 795, 796, 389 N.Y.S.2d 664, 666 (3d Dep't 1976).

dismissal of the counts relating to extortion from the Indictment on the ground that those counts failed to allege that the defendants sought to obtain "property" within the meaning of the Hobbs Act.  In rejecting this argument, this Court held that jobs (including individual work assignments), and the wages and benefits associated with those jobs, constitute "property" within the meaning of the Hobbs Act (Decision and Order, dated 1/16/04, at 20-21).

In light of this holding, the Government submits that the jobs (including work assignments), and corresponding wages and benefits, alleged in the Indictment are – as a matter of law – "property" for purposes of Hobbs Act extortion.  As this Court noted in its decision, however, the issue whether the defendants attempted to obtain the specified property is a factual one for resolution by the jury.

## IV.   CONCLUSION AND SPECIFIC GOVERNMENT REQUESTS

The Government, defense, and the Court all have an obvious interest in ensuring that the upcoming trial proceed as expeditiously and fairly as possible.  With this in mind, the Government advances several recommendations and requests.

First, given the voluminous discovery provided by the Government from the inception of this case, the extensive Jencks Act disclosures provided more than one year ago, and the tremendous factual and legal detail presented in this Memorandum and other Government filings to date, the Government believes there is no reason why any conceivable evidentiary and/or legal and/or defense-oriented issue should still remain to be resolved by the Court. Nevertheless, out of an excess of caution, the Government requests that the Court order the defense to file within one week of this date a formal objection to any of the following:

1.   the admissibility of the defendant's and Local 91's reputation for violence;

2.   the admissibility of the Local 91 union minutes and records, including the March 27, 1997 videotape of the Mulvey residence, and the handwritten notes of CELESTE regarding the Sansla and Clarion projects;

3.   the admissibility of any of the incidents and evidence described above;

4.   any other defense issue.

The Government has also repeatedly requested from the defense any exhibits, evidence or document they intend to use at trial as part of legally required reciprocal discovery.  Insofar as the defense has not supplied any such exhibits, with the exception of

a single medical record pertaining to BELLRENG, the Government requests the Court order that no such defense evidence will be allowed without a showing from the defense of good faith and due diligence.

In order to further accelerate the trial, but mindful that witness and Court schedules, along with unforseen conflicts and the sheer length of this trial, could greatly impact the anticipated order of Government proof, the Government proposes to alert the Court and defense counsel of upcoming witnesses a day before the projected witnesses will testify for the Government.

Finally, at the start of jury selection, in lieu of (or in addition to) reading potential Government witness names to the jury, the Court may wish to supply the jury with a written list to review. The Court may also wish to consider handing a printed copy of the Indictment to the jury in its opening remarks, when the

Court would in a more typical case have simply read the document to them, so that the jury may follow along with the Court's reading.

DATED: Buffalo, New York, June 14, 2006.

Respectfully submitted,

TERRANCE P. FLYNN
United States Attorney

BY:   s/William J. Hochul, Jr.
WILLIAM J. HOCHUL, JR.
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5700, ext. 887
william.hochul@usdoj.gov

BY:   s/Brett A. Harvey
BRETT A. HARVEY
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
100 State Street
Rochester, New York 14614
(585) 263-6760, ext. 2249
brett.harvey@usdoj.gov

TO:   Joel L. Daniels, Esq.
Terrence M. Connors, Esq.
John Molloy, Esq.
Joseph M. LaTona, Esq.

- 69 -

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      -v-                            02-CR-73-A (1),(5),(9),(15)

MARK CONGI,
ALBERT CELESTE,
PAUL BELLRENG,
JOEL CICERO,

                     Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2006, I electronically filed the foregoing **Government's Pre-Trial Brief and Memorandum** with the Clerk of the District Court using its CM/ECF system which would then electronically notify the following CM/ECF participant(s) on this case:

    Joel L. Daniels, Esq.

    Terrence M. Connors, Esq.

    John J. Molloy, Esq.

I hereby certify that on June 14, 2006, I mailed the foregoing **Government's Pre-Trial Brief and Memorandum**, by the United States Postal Service, to the following non-CM/ECF participant(s):

    Joseph M. LaTona, Esq.
    716 Brisbane Building
    Buffalo, New York 14203

                         s/Karen A. Brown
                         KAREN A. BROWN