UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,

vs.                                           Case No. 02-CR-73A

MARK CONGI, JOEL CICERO, et al.,

                    Defendants.

---

## MR. CICERO'S SUBMISSION IN SUPPORT OF HIS RENEWED APPLICATION FOR SEVERANCE AND HIS MOTIONS *IN LIMINE*

Respectfully submitted,

By_____
    JOSEPH M. LaTONA, ESQ.

Attorney for Defendant,
  JOEL CICERO
Office and Post Office Address
716 Brisbane Building
403 Main Street
Buffalo, New York  14203
(716) 842-0416

## PRELIMINARY STATEMENT

At the pre-trial conference on June 15, 2006, the defendants were afforded until June 21, 2006 to tender their pre-trial submissions.

This memorandum is submitted in support of Mr. Cicero's renewed application for severance and in support of his motions *in limine*.

The legal discussion portion of this memorandum is preceded by a discussion of the indictment, the evidence and the counts involving Mr. Cicero.

## THE INDICTMENT

Mr. Cicero is not charged in the racketeering conspiracy alleged in Count 1. He is only charged in Counts 13 and 14.

In Count 13, Mr. Cicero is charged with extortion under a dual theory of color of official right and wrongful use of fear. In Count 13, Mark Congi is alleged to have aided and abetted Mr. Cicero.

In Count 14, Mr. Cicero is charged with causing another individual to travel in interstate commerce to facilitate extortion in violation of New York and federal law. Count 14 also alleges that Mark Congi aided and abetted Mr. Cicero in causing the interstate travel. There is no evidence to link Mr. Congi with the interstate travel which underlies Count 14. The proof will establish that Joseph Aragon, a Colorado businessman, claims to have come to Western New York based upon a telephone communication he had with Mr. Cicero. There is no evidence that Mark Congi solicited, importuned, participated in or even was aware of any such telephonic communication.

Significantly, Counts 13 and 14, as charged by the grand jury, <u>do not</u> allege that Mr. Cicero aided or abetted Mr. Congi or that both of those defendants aided and abetted one another.

Consequently, the indictment as returned by the grand jury does not allege that Mr. Cicero associated himself with a racketeering enterprise or that his conduct as alleged in Counts 13 or 14 was committed in furtherance of enterprise objectives. Mr. Cicero's alleged actions do not comprise the relatedness or continuity requirements for a pattern of racketeering activity. <u>Sedima v. Imrex Co.</u>, 473 U.S. 479, 105 S.Ct. 3275; <u>H.J. Inc. v. Northwestern Bell Telephone Company</u>, 492 U.S. 229, 109 S.Ct. 2893; see, 1 L.Sand, et al., Modern Federal Jury Instructions § 52-23, comment.

Significantly, the means and methods by which the alleged enterprise purportedly operated all involved violence and threatened violence to people and property [Ind., ¶ 10(a)-(g)]. Counts 13 and 14 do not involve actual or threatened violence against anyone or anything.

Count 1's Racketeering Act 19, which refers to the conduct underlying Counts 13 and 14, alleges that Mark Congi acted by "aiding and abetting another" [Ind. Rac. Act 19(A), (B), (C)]. Racketeering Act 19's allegations regarding the state penal law violation asserted that the extortion was predicated upon the fear that the unnamed "other" would use or abuse his official position to the detriment of ProServe and Kulback's Construction Company. The unnamed "other" is Mr. Cicero, who at the time was one of the Commissioners of the Niagara Falls Bridge Commission.

The conspiracy count's Racketeering Act 20 alleged a conspiracy among the racketeering defendants and "others" to commit the New York State felony of grand larceny in the second degree by engaging in specific types of conduct. The specific conduct encompassed

by Racketeering Act 20 was to instill the fear of "physical injury" and "property damage" [Ind. Rac. Act 20(1), (2), (3)]. There were three distinct groups of intended victims of Racketeering Act 20 -- namely, contractors and business owners, non-union laborers and members of other labor unions. Id.

Racketeering Act 20's overt act section contains one act attributed to Mr. Cicero. According to that overt act, Mr. Cicero is alleged to have said "in sum and substance" that the Niagara Falls Bridge Commission would not allow the project at the Lewiston/Queenston Bridge to proceed without Local 91 members being used [Ind. Rac. Act 20, Overt Act 55]. Even assuming the truth of the allegations in Overt Act 55, they do not involve threatening any "physical injury" or "property damage." Accordingly, Overt Act 55 should be stricken from the indictment or any subsequently redacted version that is used at trial.

## GOVERNMENT SUBMISSIONS

On June 15, 2006 counsel received the Government Witness List ["GWL"] and the Government Pre-Trial Brief and Memo ["Gov. B&M"].

The Government Witness List identified seven individuals who will testify concerning Counts 13 and 14. They are Joseph Aragon, Thomas Daniels, Brian Kulbacki, Frank Pannozzo, Richard Jasper, David Kulbacki and Ron Adamczyk [GWL, pp. 3, 11, 18, 25, 38, 48, 52] The combined length of the estimated direct testimony of these witnesses is two hours and thirty minutes. The Government intends to call over 120 witnesses at the trial [GWL, p. 2].

The Government currently intends to elicit from witness Anthony Cerrone that on one occasion Mr. Cicero fraudulent provided Cerrone with a hazardous material handlers license in exchange for marijuana [GWL, pp. 8-9]. Obviously, that claim by Cerrone has no relevance

to Counts 13 or 14 and would be proffered as proof under Rule 404(b) of the Federal Rules of Evidence. As such, it should be excluded from the prosecution's case in chief.

Significantly, the racketeering conspiracy alleged in Count 1 encompassed the time period of October 1995 through May 15, 2002. The prosecution intends to introduce uncharged activities which both pre-date and post-date the conspiracy.

The prosecution has indicated that it might introduce activities occurring in March and April 1995 against defendants Bellreng and Celeste [Gov. B&M, p. 6, n. 6].

The Government intends to introduce evidence that after the conspiracy ended, Mark Congi directed other individuals to damage tires on vehicles then being utilized by new officers of Local 91 [Gov. B&M, p. 5, n. 5; p. 53; Gov. Supp. BP, 8/3/05, ¶ 45, pp. 24-25].

The Government intends to prove that the late Michael Quarcini and co-defendant Celeste proceeded to the Wheatfield Town Court in October 2002 in an apparent attempt to intimidate an Assistant District Attorney and a Niagara County Sheriff's deputy [Gov. B&M, p. 50].

Although not charged in this or any other indictment, the prosecution will introduce evidence that co-defendant Mark Congi attempted to thwart the grand jury's investigation and it is believed that the prosecution might also introduce evidence of post-indictment threats by Congi against potential witnesses [Gov. B&M, p. 53].

Lastly, and entirely unrelated to defendant Joel Cicero, is the prosecution's intention to introduce evidence that the other defendants in particular, and Laborers Local 91 in general, had a reputation for violence [Gov. B&M, p. 67].

4

## UNION POSITION

The prosecution intends to prove that Mr. Cicero held two positions within Laborers Local 91. Those positions were Vice President and Director of the Training Program [Gov. B&M, p. 3].

It should be noted that for approximately a one-year period in approximately 1995 that Mr. Cicero did serve as Vice President of Laborers Local 91.

Accordingly, it is submitted that the Local 91 LM-2's and Local 91 minutes referred to by the prosecution should not be admissible at Mr. Cicero's trial [Gov. B&M, p. 49].

Although Mr. Cicero was the Training Fund Director in 2001, which is when the events underlying Counts 13 and 14 took place, that position had no relationship to the alleged crimes. It is clear that the theory adopted by the grand jury is that Mr. Cicero was acting in his capacity as a Commissioner on the Niagara Falls Bridge Commission and not as a Local 91 director. In fact, the Training Fund is administered by representatives both of Local 91 and management.

In its Supplemental Bill of Particulars, the prosecution announced its intention to introduce 404(b)-type evidence to the effect that on or about March 8, 2000 co-defendant Bellrung moved to have Congi, Dellaccio and Cicero named to the Local 91 new car committee. The Cicero referred to was not the defendant, Joel Cicero, but his ex-wife, Cheryl Cicero, the daughter of the late Michael Quarcini.

Mr. Cicero requests that any reference at all to Cheryl (Quarcini) Cicero be to Cheryl Quarcini or Butch Quarcini's daughter, Cheryl. Mr. Cicero moves to exclude any evidence to the effect that he was at any time married to Cheryl.

5

In addition, Mr. Cicero seeks the exclusion of any photograph taken at the Local 91 charity golf classic or the introduction of various photos of Local 91 members [Gov. B&M, pp. 49-50].

Obviously, Mr. Cicero seeks the exclusion of any proffered evidence concerning Local 91's alleged reputation for violence [Gov. B&M, p. 67].

## SCOZZAFAVA REQUEST

Counsel urges the Court to reiterate the Rule 404(b) directive it imposed in United States v. Scozzafava. In that case, this Court instructed the prosecution to specify each item of evidence that it would attempt to introduce under 404(b) and then to provide legal justification for the admissibility of each such item.

## COUNTS 13 AND 14

In its pre-trial brief and memorandum, the prosecution attempts to summarize the proof regarding Counts 13 and 14 of the indictment.

The events concerning the meeting at Laborers Local 91 on October 2, 2001 were testified about by Joseph Aragon and Richard Jasper during the civil litigation between Aragon and his company and World Duty Free America.

At one point during his deposition of September 17, 2003, Aragon was asked about the meeting with Mr. Cicero. Aragon was specifically asked whether or not he had been intimidated by Mr. Cicero at that meeting and he responded that he was not intimidated [Exhibit A - Excerpt of Transcript, pp. 151-152; available on videotape as well].

Richard Jasper was present at the meeting between Aragon, Mr. Cicero and Mr. Congi. At his pre-trial deposition in the civil litigation, Mr. Jasper indicated that he did not even think that Mr. Cicero was purporting to act on behalf of the Niagara Falls Bridge Commission during the course of that meeting [Exhibit B - Jasper Transcript, 11/7/03, p. 57]. In addition, when asked whether there were any types of pressure or threats, Mr. Jasper stated that the only thing that was mentioned was "picketing" [Exhibit C - Jasper Transcript, 11/7/03, pp. 59-60].

The prosecution claims that before the October 2, 2001 meeting that a representative from Duty Free America informed Aragon that Aragon should provide something to the union to avoid "contractual problems with the Bridge Commission" [Gov. B&M, p. 44]. That statement is clearly "spin" from Joseph Aragon. The contractual lease documents running from the Niagara Falls Bridge Commission to World Duty Free and from World Duty Free to ProServe specifically vested all control over the construction project to ProServe and Joseph Aragon. In fact, Joseph Aragon testified before the grand jury that under the contractual documents it was entirely within his own discretion or that of his general contractor as to whether or not to use union labor [Aragon GJ, p. 25].

## EMMONS AND NEW YORK EXCEPTION

The prosecution seeks a pre-trial order prohibiting any defendant from pursuing a claim of right defense under United States v. Emmons, 410 U.S. 396, 93 S.Ct. 1007. Insofar as the prosecution request relates to Counts 13 and 14, this Court did hold that the claim of right defense as embodied in Emmons does not apply to an extortion committed under color of official right [D&O, 1/16/04 at 17-18; Gov. B&M, p. 65].

However, the Government has expediently ignored the two-fold theory of extortion as found by the grand jury and embodied in Count 13. Count 13 expressly alleges that the extortion was committed by the "wrongful" use of fear, including fear of economic harm, <u>and</u> 'under color of official right." As Count 13 alleges both forms of extortion, the prosecution is obliged to establish beyond a reasonable doubt that both forms of extortion were committed. Any deviation from that twofold burden would constitute a constructive amendment of the indictment. <u>Stirone v. United States</u>, 361 U.S. 212; <u>United States v. Wozniak</u>, 126 F.3d 105; <u>United States v. Roshko</u>, 969 F.2d 1.

Consequently, an <u>Emmons</u> claim of right defense does apply to Counts 13 and 14 of the indictment. The right to such a defense is bolstered by the testimony of Richard Jasper. Mr. Jasper testified that the only pressure that was mentioned at the meeting was picketing, which is a legitimate labor activity.

In addition, Count 14 alleges that the interstate transportation was undertaken to facilitate a violation of both New York and federal law. Obviously, <u>Emmons</u> applies to both Counts 13 and 14.

In addition, as to Count 14, the New York State labor exemption is applicable.

New York State Penal Law §155.05(e) defines larceny by extortion. In pertinent part, that statute provide that an extortion can occur where an individual instills fear in another that,

> "[c]ause a strike, boycott or other collective labor group action injurious to some person's business; <u>except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of a group in whose interest the actor purports to act</u>" (emphasis supplied).

8

Consequently, both <u>Emmons</u> and the New York State labor exception apply to Count 14.

## SEVERANCE

Mr. Cicero had previously moved for severance. Mr. Cicero's severance application is being renewed at this time.

As stated above, Mr. Cicero is not indicted under the Count 1 racketeering conspiracy charge.

The prosecution's pre-trial memorandum is replete with references to the other defendants and their use of the Local 91 enterprise to engage in a pattern of actual and threatened force, violence and witness intimidation [Gov. B&M, pp. 5-6]. The prosecution agreed that the indictment does not allege that Mr. Cicero engaged in any actual or threatened use of force or violence [Gov. B&M, pp. 1-2].

As recited above, the estimated prosecution direct testimony regarding Counts 13 and 14 is two and one-half hours. That is less than one-half court day.

The presentation of the rest of the evidence against the other defendants will encompass approximately six weeks of proof.

In <u>United States v. Spinelli</u>, 352 F.3d 48 (2003), the Second Circuit expressly observed that,

> "[t]here are, of course, cases in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." 352 F.3d at 56.

9

In <u>United States v. DiNome</u>, 954 F.2d 839 (1992), the Second Circuit held that two defendants should have been severed at trial once a Rule 29 motion had been made dismissing the racketeering charges against those defendants. 954 F.2d at 844-845.

Mr. Cicero occupies the same position now as the Hellman defendants in <u>DiNome</u> occupied when their Rule 29 motion was granted but their mistrial motion denied.

In reversing the Hellman defendants' convictions, the Second Circuit expressly recognized that,

> "[w]e cannot escape the conclusion that the evidence against the Hellmans' co-defendants including vicious murders, loan sharking, auto theft, pornography, and firearms trafficking and the very nature of the DeMeo Crew -- was prejudicial to the Hellmans." <u>Id</u>.

The Second Circuit also observed that the Hellman defendants should have been severed, noting that such a trial "could have been completed in a very short period of time, with the risk of spillover prejudice entirely eliminated." 954 F.2d at 845.

In <u>United States v. Branker</u>, 395 F.2d 881 (2d Cir. 1968), all of the defendants were named in a conspiracy count and they proceeded to trial. At the conclusion of the Government's case, the conspiracy charge was dismissed as were several substantive counts. At that time various defendants moved for severance.

The severance motions were denied and on appeal, the Second Circuit held that four of the defendants should have been severed.

In reversing the convictions of four defendants, the Second Circuit noted that,

> "[i]t is obvious that as the number of counts is increased, the record becomes more complex and it is more difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind. This kind of prejudice is particularly injurious to

10

> defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants. The jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve these defendants in any way. As trial days go by, 'the mounting proof of the guilt of one is likely to affect another.'" 395 F.2d at 887-888; citations omitted.

As was the case in DiNome, Mr. Cicero is in exactly the same position that the defendants were in Branker when the conspiracy charge against them was dismissed.

Given the 404(b)-type evidence to be introduced against the other defendants, severance is also warranted under the Second Circuit decision in United States v. Figueroa, 618 F.2d 934.

Even in United States v. Cervone, 907 F.2d 332 (2d Cir. 1990), the decision relied upon by Magistrate/Judge Foschio in initially denying the severance motion, the Court commented upon the character of the evidence and the impossibility that spillover might induce a jury to attribute criminal intent to the ambiguous conduct of a non-conspirator. 907 F.2d at 342.

In sum, it must be concluded that the fair trial rights of Mr. Cicero will irreparably be damaged in the event he is compelled to proceed to trial with each of his co-defendants on all of the charges set forth in the second superseding indictment.

Unquestionably, the trial of Counts 13 and 14 could be resolved within a few days, a week at most.

As an alternative to severing Mr. Cicero for trial by himself, counsel suggest a severance of Counts 13 and 14 from the other counts of this indictment.

Such a severance and separate trial of counts would avoid the necessity of any duplication of witness testimony and any concomitant inconvenience.

11

## ARAGON SETTLEMENT

Unquestionably, Joseph Aragon is the key witness against Mr. Cicero. It was Mr. Aragon who purportedly was induced to travel in interstate commerce for the purpose of being extorted under federal and New York State law. Count 13 alleges that it was Aragon who was extorted at the meeting of October 2, 2001.

The defense theory is that Aragon falsely accused Mr. Cicero of extortion to fabricate an excuse for his default on his contractual obligations to World Duty Free America. Aragon's scheme was furthered when he falsely claimed to the Niagara Falls Reporter that the Niagara Falls Bridge Commission, Duty Free America and Laborers Local 91 colluded to steal over $1 million from him [Exhibit D].

Civil litigation was pending between World Duty Free and Joseph Aragon at the time he conveyed his false claim to the Niagara Falls Reporter. A libel action ensued and ultimately Aragon agreed to pay money to World Duty Free and to submit a letter for publication by the Niagara Falls Reporter in which he denied accusing World Duty Free of any collusion [Exhibit E] As we know, the Niagara Falls Reporter stands by its original story concerning Aragon's comment [Exhibit F].

Defense counsel proposes to cross-examine Mr. Aragon on his settlement arrangement with Duty Free as well as his communications with the Niagara Falls Reporter. Such cross-examination is in furtherance of the defense theory and should be permitted. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105  Counsel also reserves the right to admit extrinsic evidence concerning the settlement agreement and counsel should be allowed to do so. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920; United States v. Harvey, 547 F.2d 720.

During the appearance on the Niagara Falls Reporter's motion to quash a defense-issued subpoena, the Court indicated that any evidence concerning the settlement between Joseph Aragon and World Duty Free might be inadmissible under Rule 408 of the Federal Rules of Evidence.

In the Second Circuit, Rule 408 does not apply to criminal cases. <u>Manko v. United States</u>, 87 F.3d 50.

In any event, even if the rule did apply, it expressly contains an exception where the evidence is proffered to establish "bias or prejudice of a witness."

## CONCLUSION

Mr. Cicero should be severed from the other defendants. Alternatively, Counts 13 and 14 should be severed for a separate trial. Moreover, the Court should grant the other relief sought in this memorandum.

DATED:   June 21, 2006
         Buffalo, New York                    Respectfully submitted,

                                              _____
                                              JOSEPH M. LaTONA

                                              Attorney for Defendant,
                                                JOEL CICERO
                                              Office and Post Office Address
                                              716 Brisbane Building
                                              403 Main Street
                                              Buffalo, New York  14203
                                              (716) 842-0416

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that the foregoing document was filed on a CD-Rom in .PDF format, via hand delivery, with the following:

**CLERK OF THE COURT
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**
68 Court Street
Buffalo, New York 14202

IT IS HEREBY further certified that a true copy of the foregoing document was served, via hand delivery, upon the following:

**WILLIAM J. HOCHUL, JR., ESQ.**
Assistant United States Attorney
138 Delaware Avenue
Buffalo, New York 14202

this 21st day of June, 2006.

_____
SANDRA LEE WRIGHT